IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION


NATHAN ROBINSON                                                    PLAINTIFF


VS.                              CASE NO. 07-CV-1094


CONAGRA POULTRY COMPANY and
PILGRIM'S PRIDE, INCORPORATED                          DEFENDANTS


## MEMORANDUM OPINION

Before the Court is Defendants' refiled Motion for Summary Judgment. (Doc. No. 17).

The Plaintiff has responded. (Doc. No. 21). The Defendants have filed a reply to the Plaintiff's

response. (Doc. No. 26). The matter is ripe for consideration.

## BACKGROUND

Nathan Robinson is African-American. In 1980, he began working for the Defendant

ConAgra Poultry Company at its chicken processing plant in El Dorado, Arkansas. From 1980

to 1991, Robinson worked in the pre-pack department at the plant. In 1991, he successfully bid

on and accepted a production position in the plant's rendering department. On or about

November 24, 2003, Defendant Pilgrim's Pride purchased ConAgra Poultry, along with the El

Dorado processing plant. After the acquisition, Robinson continued to work at the plant. He is

currently employed by Pilgrim's Pride as a forklift operator on the unloading deck in the plant's

rendering department.

During their respective periods of ownership, both ConAgra and Pilgrim's Pride

maintained anti-discrimination policies at the plant. Each company's policy prohibited

intimidation, harassment and hostile acts against employees.  Each policy provided a mechanism for reporting discrimination and/or harassment complaints, as well as a confidential 1-800 hotline for reporting such complaints.  Each company conducted anti-harassment and discrimination training sessions for its employees.  Robinson knew of each company's reporting procedure.  He also knew of Pilgrim's 1-800 hotline for reporting any work related problems.

Robinson belongs to the United Food and Commercial Workers Union Local 2008, the Union at the plant.  As a Union member, Robinson could utilize the collective bargaining agreements' grievance procedure to file complaints about aspects of his employment, including any racial discrimination and/or harassment.  The grievance procedure consisted of four steps through which the complaining employee and the company would attempt to resolve the dispute. If a resolution could not be reached after the third step, the employee could take the complaint to binding arbitration.  Robinson was aware of the Union's grievance procedure.

The rendering department is a stand alone facility that is separate from the main plant.  It has its own bathrooms and  own break room.  The rendering department converts chicken by-products into useable forms for non-human consumption such as dog food.  Rendering department employees use grinders and cookers to convert the by-products into useable forms. The converted products are then placed on trailers by use of forklifts and shipped to third-party businesses.

In 1991, Robinson successfully bid on and accepted the position of operator trainee in the feathers area of the rendering department.  At the time of his transfer, there were two Caucasian supervisors over this area, Bill Devault and Randy Beaver.  Robinson eventually worked his way up from trainee to the feather operator position.  He worked the day shift in this area.

In 1999, the feathers area was closed.  Robinson was temporarily transferred to the plant's 28 Degree Room.  He stayed in this temporary position for approximately six months.

Thereafter, Robinson transferred to the Friskey's Room where he was a machine operator. Robinson's duties entailed pushing control buttons on the rendering machines, which caused the machines to grind the chicken parts and send them to the delivery trucks.  He worked the graveyard shift in the Friskey's Room.  During this time, Robinson was supervised by Kenny Jackson, an African-American, Randy Beaver, a Caucasian, and Walter Cribb, a Caucasian

In 2004, Pilgrim's quit doing business with Friskey's.  As a result, the Friskey's Room where Robinson worked was closed.  Thereafter, Robinson became a forklift operator on rendering's unloading deck.  Robinson is currently working in this position

In this position, Robinson is responsible for driving a forklift and cleaning the rendering area.  He works the graveyard shift from 8:45 p.m. until 5:15 a.m.  Robinson works with Randy Miles, an African-American.  Robinson and Miles are the only two forklift operators on the graveyard shift.  The maintenance men who work this shift are Billy Wayne Cook and Rodney Henry, both African-Americans.

During the first 45 minutes of his shift, Robinson is supervised by a lead person named Willie Candyle.  Candyle is African-American.  During the last 15 minutes of his shift, Robinson is supervised by Randy Beaver, the Caucasian day shift supervisor.  There is no supervisor present for the remainder of Robinson's shift other than maintenance man Billy Wayne Cook When Candyle leaves for the day, Cook is responsible for making sure the rendering department runs smoothly.

Robinson has no complaints regarding his treatment by Bill Devault or Kenny Jackson.

3

He does, however, complain about his treatment by his Caucasian supervisors, Randy Beaver and Walter Cribb.

Robinson claims that Randy Beaver harassed him by "staying on him" to do his work. Robinson claims that Beaver's conduct was aggravating because he is a grown man and he knows what to do and when to do it. Robinson states that Beaver would stand over everyone in the rendering department. He also states that if Beaver got mad or his bosses got on to him about something he would take it out on the rendering department employees. Robinson admits that Beaver never used any racial slurs toward him or in front of him. He also admits that Beaver never used any profanity toward him. In fact, Robinson states that he has no reason to believe that Beaver is a racist.

At some point, Robinson called Pilgrim's 1-800 hotline and complained about Beaver's treatment of him. During the call, Robinson stated that Beaver was driving and pushing him to get his work done. He stated that it was aggravating because Beaver treated him like he didn't know his job. Robinson did not characterize Beaver's behavior as racist or as race discrimination.

Robinson claims that in November or December 2004, Walter Cribb harassed him by blaming him for a mechanical breakdown in the rendering department. Robinson states that Cribb jumped on him and Randy Miles as if the breakdown was their fault. He states that Cribb get hot and frustrated and took it out on them. Robinson states that Cribb told them, "If ya'll can't do it my way, I'm going to write ya'll up and fire ya'll." Neither Robinson or Miles received a write up or was fired. Robinson admits that Cribb never used any racial slurs or racially derogatory language in this outburst. He also admits that Cribb never directed any

4

profanity toward him.

Robinson complained about Cribb's behavior to a Union steward named Vicki. Thereafter, Cribb never jumped on Robinson again about a mechanical breakdown.  In fact, Robinson states that Cribb never harassed him in any other way after November or December 2004.

Robinson claims that from 1980 to 1991, while he was in the plant's pre-pack department, he was harassed by Caucasian supervisors Ken Hall, Buddy Wesson, Granville Record and Don Barber.  He claims that in the early 80's, Ken Hall treated him and other African-American differently on breaks and would yell and holler at them.  Robinson states that Hall would point to his watch during their break time.  Robinson also states that Hall would holler, "Women out of meat, Women out of meat" during the shift.

Robinson claims that from 1980 to 1985, Buddy Wesson did  not let him off work on two occasions.  Robinson states that in response to his requests for time off, Wesson told him that he didn't have any personal-leave days available to him and he was needed at work.

Robinson claims that from 1990 to 1991, Granville Record would cuss and scream at employees.  He states that in 1990, Record yelled at him and pointed his finger at him.  Robinson also states that he overheard Record call a co-worker a "boy."

Finally, Robinson claims that years ago, Don Barber kicked at him.  Robinson states that one time when he was walking into a meeting at the plant, Barber made a motion with his leg indicating that Robinson needed to get into the meeting.   Barber told Robinson that he was playing and wanted him to get into the meeting because he was late.  Robinson admits that Barber's leg never made contact with him.  He also admits that he has never been kicked by

anyone at the plant.

Robinson claims that during his tenure at the plant, he heard racial slurs and/or racially derogatory language on several occasions.  However, he admits that no supervisor ever directed any racial slurs or epithets toward him.

Robinson claims that in 1993, he had a confrontation with a Caucasian co-worker named Jamie.  In the exchange, Jamie called Robinson a "nigger."  Robinson immediately went to his supervisor, Billy Ray Wallace, and told him about the incident.  Wallace took Jamie to the personnel office and wrote him up.  After that incident, Jamie never directed that word or any other racial slur toward Robinson again.

Robinson claims that in 1995, Roy Loper, a Caucasian co-worker, said to Robinson and another African-American co-worker, "You boys like collard greens and watermelons."  Robinson immediately went to his supervisor, Bill Devault, and told him about the statement.  Devault told Robinson that he would take care of it.  After that, Loper never said anything like that to Robinson again.

Robinson claims that sometime before 2000, he was walking by the break room in the main plant and he overheard some Caucasian maintenance men use the "N" word.   The word was not directed toward Robinson or any other African-American employee.  Robinson states that hearing the word bothered him but he did not report it to anyone in management or the Union.

Finally, Robinson claims that in 2000, Jay Honeycutt, a Caucasian co-worker, made the statement to Robinson that Jerry Hunter, their Caucasian supervisor, was working him like a "nigger."  Robinson states that after Honeycutt made the statement to him, he went outside for

6

about an hour or two to think.  After that time, Robinson  returned to work.  He  went to his supervisors, Jerry Hunter and Randy Beaver, and told them about Honeycutt's statement.  Hunter and Beaver told Robinson that they would look into the matter. After that, Honeycutt never used the "N" word in front of Robinson again.

Robinson claims that profanity was directed toward African-Americans at the plant. However, he never had any profanity directed toward him by his supervisors–Caucasian or African-American.  Robinson also never witnessed any nooses at the plant.

Robinson claims that the walls of the bathrooms in the main plant and in the rendering department were defaced with racial graffiti.  Robinson states that he once left his work to go complain about the graffiti.  He admits that the graffiti never referred to him personally or threatened him physically.  Robinson also admits that the Defendants painted over the graffiti time and time again.

In 1997, Robinson complained to a Union steward about the graffiti on the walls in the rendering department's bathroom.  He states that when he went to complain he left work for about an hour.  After he voiced his complaint, the Union steward told Robinson that she would look into the matter.  Thereafter, the rendering bathroom walls were painted by the Defendants. Robinson admits that he has not seen any racial graffiti on the bathroom walls in the rendering department since 2001.

In 2004, Robinson complained to a Union steward about the graffiti and the nasty condition of the pre-pack bathroom in the main plant.  After Robinson complained, the bathroom walls in the pre-pack area were painted.

Robinson claims that the Defendants have been lax in regard to the safety of African-

Americans working at the plant.  In support of this claim, Robinson states that on one occasion a motor fell and landed near him, on one occasion he became overheated at work, and on one occasion there was a bomb threat at the plant.

Robinson states that when he was working in the Friskey's Room, a suspended motor fell from the ceiling and landed near him.  He claims that he could have been killed if the motor had hit him.  Robinson states that Randy Beaver, his supervisor, asked him if he was alright and allowed him take an hour break to calm down.  Thereafter, Robinson returned to work.

Robinson states that in 2003, when he was working in the feathers area, he and several other workers became overheated.  He states that the plant's safety manager came down to rendering, took their body temperatures and made them get in a cool place to cool off.  Cooling rags were put on their heads.  The employees were allowed to cool off for about 20 minutes before being told to go back to work.  Robinson continued to cool off and returned to work after about an hour.

Robinson states that in 2003, there was a bomb threat at the plant.  During the threat, all employees were directed to leave the plant and stand inside the gate by the security building. Robinson claims that this was not a far enough distance from the plant to be safe.  Robinson admits that all employees were held inside the gate, not just African-Americans.

Robinson admits that during his tenure at the plant there were numerous safety policies and procedures in force.  He admits that there were safety meetings conducted at the plant which he attended.   He also admits that he has never been physically injured at the plant due to lax safety.

Robinson claims that he and other African-American employees are assigned the dirtiest

jobs in the plant.  In support of this claim, he states that there are no Caucasians working in the back dock area when they hang the chickens.  Robinson also claims that African-American maintenance men are ordered to do dirty jobs that Caucasian maintenance men don't have to do. Robinson admits that he does not work in the back dock area and never has.  He also admits that he is not a maintenance man and has never been ordered to perform any of the allegedly dirty maintenance jobs.

Finally, Robinson claims Caucasian employees are hired and promoted with more ease than African-American employees.  In support of this claim, Robinson states that he twice applied for and was denied a position to maintenance.  He claims that he was denied these positions even though he was qualified for them.

In October 2002, Robinson applied for a night shift maintenance job in rendering.  He was third in line in terms of seniority for that position.  Therefore, he did not receive the job.

In July 2002, Robinson applied for a Class C maintenance job in the pre-pack department. To qualify for this job, the applicant had to have either a technical school degree or one to two years of mechanical experience.  Robinson was first in line in terms of seniority for the position. However, he did not possess the mechanical experience or have a technical school degree. Therefore, Robinson did not receive the job.

Robinson filed three Union grievance in his twenty-five plus years at the plant.  The first was filed in December 2001 after Robinson was suspended for being insubordinate to a member of management.  As a result, Robinson was suspended for five days without pay.  In his Union grievance, Robinson asked to be paid for the five day suspension period.  The grievance went though all four steps of the grievance procedure.  The matter was eventually resolved by

9

ConAgra agreeing to pay Robinson for the five day suspension.  The grievance did not contain any language alleging race discrimination, racial harassment or a racially hostile work environment.

The other two grievances were filed on January 18, 2002.  The first grievance claimed that Robinson was denied overtime work in the rendering department.  The second grievance claimed that Robinson should have received double pay for work done on a Sunday.  Both grievances went through the third step of the grievance procedure and were denied by ConAgra.  Neither grievance contained any reference to race discrimination, racial harassment or a racially hostile work environment.

On December 22, 2003, Robinson, along with seven other employees, filed a class action lawsuit against ConAgra and Pilgrim's Pride.  In the Class Action Complaint, Robinson alleged that he had been subjected to racial discrimination at the El Dorado plant.  He claimed that the discrimination was in the form of disparate treatment, failure to promote, and a hostile work environment in violation of 42 U.S.C. § 1981 and the Arkansas Civil Rights Act of 1993.

On May 31, 2005, the Defendants moved for summary judgment on all of Robinson's claims.  Thereafter, on March 28, 2006, the Court denied summary judgment as to all of Robinson's claims on the ground that merits-based discovery had not begun.  The Court ruled that the motion was premature.  It also ruled that it could be refiled at a later date.

On May 15, 2007, the Court denied the Class Action Plaintiffs' Motion for Class Certification.  Thereafter, the parties agreed that each class representative would proceed with their individual claims in separate lawsuits under newly assigned case numbers.  The parties also agreed that no additional discovery was needed and that the Defendants could refile their

previously filed summary judgment motions against the individual plaintiffs.

On September 19, 2007, Robinson filed his individual Complaint against the Defendants. On November 13, 2007, Robinson amended his Complaint.  In his Amended Complaint, Robinson alleges that the Defendants discriminated against him because of his race in violation of 42 U.S.C. § 1981 and the Arkansas Civil Rights Act of 1993 ("ACRA"), Ark. Code Ann. § 16-123-102, 107.   Specifically, Gill  claims that he was subjected to a hostile work environment at the plant.[1]  The matter is now before the Court on Defendants' refiled Motion for Summary Judgment.

<u>STANDARD OF REVIEW</u>

The standard of review for summary judgment is well established.  The Federal Rules of Civil Procedure provide that when a party moves for summary judgment;

> The judgment sought shall be rendered forthwith if the pleadings, dispositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Krenik v. County of LeSueur,* 47 F.3d 953 (8th Cir. 1995).  The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial–whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

_____

[1]  In his Amended Complaint, Robinson did not reassert his claims for disparate treatment or failure to promote that were raised in the Class Action Complaint, *Goodwin, et al. v. ConAgra Poultry Company and Pilgrim's Pride, Incorporated,* 03-CV- 1187.  Therefore, the Court will only address Robinson's hostile work environment claim in this opinion.

11

*Anderson v. Liberty Lobby, Inc.,* 447 U.S. 242, 250 (1986). *See also Agristor Leasing v. Farrow,* 826 F.2d 732 (8th Cir. 1987); *Niagara of Wisconsin Paper Corp. v. Paper Indus. Union-Management Pension Fund,* 800 F.2d 742, 746 (8th Cir. 1986). A fact is material only when its resolution affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id.* at 252.

The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of LeSueur,* 47 F.3d at 957. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 256.

<u>DISCUSSION</u>

In his Amended Complaint, Robinson alleges that he was subjected to a hostile work environment when he was subjected to abusive language at the plant, witnessed racial graffiti on the bathroom walls at the plant, witnessed African-American employees being treated differently than Caucasian employees in that they were treated in a disrespectful manner, subjected to unsafe working conditions, was required to do "dirty" jobs at the plant and was denied a promotion for which he was qualified. He claims that this racial discrimination was in violation of 42 U.S.C. §

1981 and the Arkansas Civl Rights Act of 1993 ("ACRA"), Ark. Code Ann. § 16-123-102, 107.

In employment discrimination cases under 42 U.S.C. § 1981 and the ACRA, the courts apply the familiar three-step burden shifting framework set out in *McDonnell Douglas Corp. v. Green,* 41 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Putman v. Unity Health Sys.,* 348 F.3d 732, 735 n.2 (8th Cir. 2003)(applying *McDonnell Douglas* to § 1981 claim); *Crone v. United Parcel Serv., Inc.,* 302 F.3d 942, 945 (8th Cir. 2002) (applying *McDonnell Douglas* to ACRA claim). Under *McDonnell Douglas,* the plaintiff must first establish a *prima facie* case of discrimination. If the plaintiff is able to do this, the burden of production then shifts to the defendant to assert a legitimate non-discriminatory reason for the alleged discrimination. If the defendant sets forth such a reason, the burden then shifts back to the plaintiff to establish that the asserted reason was merely a pretext for discrimination. The Court will review each of Robinson's claims in light of the above burden shifting framework.

Robinson claims that he has been subjected to a hostile work environment at the plant. In order to establish a racially hostile work environment claim, an employee must show that: 1) he was a member of a protected group; 2) he was subjected to unwelcome race-based harassment; 3) the harassment was because of his membership in the protected group; and 4) the harassment affected a term, condition, or privilege of his employment. *Elmahdi v. Marriott Hotel Services, Inc.,* 339 F.3d 645 (8th Cir. 2003). Harassment which is severe and pervasive is deemed to affect a term, condition, or privilege of employment. *Elmahdi,* 339 F.3d. at 652. The conduct must be severe "as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim." *Id.* (quoting *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 840 (8th Cir. 1998)). Merely feeling offended, however, does not sufficiently affect the conditions of

13

employment to support a claim.  *Id.,* 339 F.3d at 653 (citing *Harris v. Forklift Sy*s., *Inc.,* 510 U.S. 17, 21 (1993)).  In determining whether sufficient evidence of a hostile work environment claim has been presented, courts consider all the attendant circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.  *Elmahdi,* 339 F.3d. at 652-53.  To satisfy the high threshold of actionable harm, the employee must show that his workplace was permeated with discriminatory intimidation, ridicule and insult.  *Elmahdi,* 339 F.3d. at 653.

<u>*Abusive Language at the Plant*</u>

Robinson claims that he was subjected to a hostile work environment by the Defendants when he was subjected to abusive language at the plant.  There is no doubt that Robinson is a member of a protected group – African-American.  Thus, he can establish the first element of his *prima facie* case of hostile work environment.  However, the Defendants contend that Robinson can not show the other elements of his *prima facie* case – that he was subjected to unwelcome race-based harassment, that the alleged harassment was because of his membership in the protected group and that it affected a term, condition or privilege of his employment.

In support of his claim, Robinson claims that on several occasions during his tenure at the plant he either overheard racial slurs used by Caucasian employees or the slurs were directed toward him personally.  Robinson, however,  admits that no supervisor ever directed any racial slurs or racial epithets toward him.

Robinson claims that in 1990, he overheard a Caucasian supervisor in the pre-pack department call an African-American employee a "boy."  Robinson claims that in 1993, a

14

Caucasian co-worker called him a "nigger" during a verbal confrontation.   In 1995, a co-worker made the statement, "You boys like collard greens and watermelons" to Robinson and another African-American employee.   Sometime before 2000, while walking by the break room, he overheard a group of Caucasian maintenance men use the "N" word.   And in 2000, a Caucasian co-worker made the statement, "Jerry Hunter is working me like a nigger" in front of Robinson.

Five racial slurs over a twenty-five plus year period are not severe or pervasive enough to create a hostile work environment[2].   *Woodland v. Joseph T. Ryerson & Sons, Inc.,* 302 F.3d 839, 844 (8th Cir. 2002).   While offensive, such comments would not be viewed by a reasonable person as hostile.   *See Singletary v. Mo. Dep't of Corrs.,* 423 F.3d 886, 893 (8th Cir. 2005).   Such offhand comments and isolated incidents will not amount to a discriminatory change in the terms or conditions of employment.   *Wallin v. Minnesota Dept. of Corrections,* 153 F.3d 681, 688 (8th Cir. 1998).   They do not constitute a "steady barrage of opprobrious racial comment."   *Elmahdi* 339 F.3d at 653 (quoting *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir. 1981)).   Also, when Robinson reported the incidents involving co-worker slurs to management,[3] remedial action was taken and the offending co-worker never directed any racial slurs toward Robinson or in front of him again.   *See Palesch v. Mo. Comm'n on Human Rights,* 233 F.3d 560, 566-67 (8th Cir. 2000).   Thus, the comments of which Robinson complains are insufficient to establish a

---

[2] Robinson claims that he could not work for an hour or two after the 2000 incident. After that, Robinson returned to work.  The incident did not unreasonably interfere with Robinson's ability to do his job.  Therefore, it does not rise to the level of a hostile work environment.

[3] Robinson reported three of the four incidents to management.  He did not report overhearing  the "N" word used by Caucasian maintenance men sitting in the break room.

cause of action for a hostile work environment.

Robinson also claims that during his tenure at the plant, his Caucasian supervisors would yell at him.  He states that in the early 80's, Ken Hall, his supervisor in the pre-pack department, would holler, "Women out of meat, Women out of meat" to Robinson and the other workers on his shift.  In 1990, Granville Record, another supervisor in pre-pack, yelled and pointed his finger at Robinson.  And in 2004, Walter Cribb, his supervisor in rendering, yelled at him and Randy Miles saying, " If ya'll can't do it my way, I'm going to write ya'll up and fire ya'll."

These outbursts did not contain any racial slurs or racially derogatory language.  There was nothing inherently racial about them.  There is no evidence that they were motivated by or based upon Robinson's race.  *See Schoffstall v. Henderson,* 223 F.3d 818, 826 (8th Cir. 2000).  Thus, Robinson was not subjected to unwelcome race-based harassment in these instances.  They were also not so severe or pervasive as to have affected a term or condition of Robinson's employment.  Thus, these outbursts by Robinson's supervisors are insufficient to support Robinson's claim of a hostile work environment.

Finally, Robinson claims that profanity was directed toward African-American employees at the plant.  However, he does not claim that any profanity was ever directed toward him.  Thus, the use of profanity did not affect a term or condition of Robinson's employment and did not create a hostile work environment for him.

The discrimination laws are not a general civility code.  Thus, the abusive language of which Robinson complains is not what a reasonable person would consider harassment.  It was not severe or pervasive enough to amount to a discriminatory change in the terms and conditions of his employment.  Thus, Robinson has failed to establish a *prima facie* case of hostile work

16

environment in connection with the alleged abusive language at the plant.  Accordingly, the Court finds that this claim must fail as a matter of law.

### *Racial Graffiti in the Bathroom*

Next, Robinson claims that the presence of racial graffiti on the bathroom walls in the main plant and in the rendering department created a hostile work environment for him.  He claims that in 1997, he left work to complain to a Union steward about the graffiti in the rendering bathroom.  After his complaint, the walls of the bathroom were painted.  He also claims that in 2004, he complained to a Union steward about the graffiti and the nastiness of the bathroom in the main plant.  After his complaint, the walls of the bathroom were painted.

In this instance, the graffiti was not specifically directed at Robinson.  It did not physically threaten him.  It did not affect his ability to work.  It was painted over by the Defendants.  It is apparent that the presence of graffiti on the walls in the bathrooms was not sufficiently severe or pervasive enough to affect the terms and conditions of Robinson's employment.  *See Woodland,* 302 F.3d at 843-44.  Thus, Robinson has failed to establish a *prima facie* case of a hostile work environment in connection with the presence of graffiti in the bathrooms.  Accordingly, the Court finds that this claim must fail as a matter of law.

### *African-American Employees treated Disrespectfully*

Robinson claims that he was subjected to a hostile work environment when he witnessed African-American employees being treated differently than Caucasian employees in that they were treated in a disrespectful manner.  Robinson claims that this disrespect was evidenced by profane and demeaning language used toward African-American employees at the plant.  However, Robinson offers no evidence of any profanity used at the plant.  The only evidence he

offers of demeaning language involves the statements allegedly made by Ken Hall in the early 80's, Granville Record in 1990, and Walter Cribb in 2004. These are not severe or pervasive enough to have affected a term or condition of Robinson's employment. *See Bradley v. Widnall,* 232 F.3d 626, 631-32 (8th Cir. 2000). Thus, they are not sufficient to create a hostile work environment.

Robinson next claims that this disrespect was evidenced by demeaning behavior directed toward him and other African-American employees at the plant. In support of this claim, Robinson points to the fact that Ken Hall pointed at his watch during break time in the 1980's, that Buddy Wesson twice refused to let him off work in the 1980's, years ago Don Barber kicked at him when he needed Robinson to get into a meeting, Randy Beaver pushed him to get his work done and Walter Cribb blamed him for mechanical breakdowns in the rendering department. This behavior is not severe or pervasive enough to have affected a term or condition of Robinson's employment. Rather, it represents unpleasant conduct by a demanding supervisor. Such claims do not equate to an actionable hostile work environment claim. *Id*. Thus, Robinson has failed to establish his *prima facie* case of hostile work environment in this regard. Accordingly, the Court finds that this claim must fail as a matter of law.

### Unsafe Working Conditions

Robinson claims that African-American employees at the plant have been subjected to unsafe working condition at the plant. In support of this claim, Robinson points to the fact that a suspended motor fell and landed near him, that once he became overheated at work and that during a bomb threat the employees were held inside the gate by the security building.

There is no evidence that these alleged unsafe conditions affected a term or condition of

18

Robinson's employment.  He was never physically injured due to lax safety.  There is also no evidence that the alleged unsafe conditions of which Robinson complains were based upon or motivated by race.  All employees, African-American, Caucasian and Hispanic, were subjected to same alleged unsafe conditions at the plant.  Thus, there is no evidence to support Robinson's claim of a hostile work environment in this regard.  Accordingly, the Court finds that this claim must fail as a matter of law.

### *Assignment of "Dirty" Jobs*

Robinson claims that he and other African-American employees were assigned the "dirty" jobs while Caucasian employees were not.  He claims that the jobs in the back dock area where they hang the chickens are "dirty" jobs.   However, Robinson admits that he does not work in the back dock area and never has.  Rather, he drives a forklift on the unloading deck.  Robinson also claims that African-American maintenance men were ordered to do dirty job while Caucasian maintenance men were not.  However, Robinson admits that he is not a maintenance man and never has been.  He as never been ordered to do any allegedly dirty maintenance jobs.  Thus, there is no evidence to support  Robinson's claim of a hostile work environment in this regard.  Accordingly, the Court finds that this claim must fail as a matter of law.

### *Denial of Promotions*

Finally, Robinson claims that he was denied a promotion to maintenance for which he was qualified.  He claims that this denial created a hostile work environment for him.

A hostile work environment is created by verbal or physical harassment directed at an employee and based upon his membership in a protected class.  This harassment must be sufficiently severe or pervasive to affect the terms or conditions of one's employment.  Here,

19

Robinson is not alleging that he was subjected to verbal or physical harassment.  Rather, he is

alleging acts of disparate treatment at the hands of the Defendants.  While these acts may have

resulted in a frustrating work situation for Robinson, they did not create a work environment

permeated with discriminatory intimidation, ridicule or insult.  Thus, there is insufficient

evidence to support a claim of a hostile work environment in this regard.  Accordingly, the Court

finds that this claim must fail as a matter of law.

CONCLUSION

For the reasons discussed herein above, the Court finds that Defendants' refiled Motion

for Summary Judgment should be and hereby is **granted**.  A judgment of even date, consistent

with this Opinion, will be issued.

IT IS SO ORDERED, this 30th day of September, 2008.


               /s/Harry F. Barnes             
               Hon. Harry F. Barnes
               United States District Judge

20
